## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

_____

GREGORY A. MORIVA,

        Plaintiff,

v.                                        Case No.: 21-cv-817

THIS CITY OF MONONA, et al.

        Defendants.

_____

### DEFENDANTS' RESPONSE TO PLAINTIFF'S ADDITIONAL
### PROPOSED FINDINGS OF FACT

_____

Defendants, City of Monona, and Ryan Losby, by their attorneys, Wirth + Baynard, submit this Response to Plaintiff's Additional Proposed Findings of Fact in Support of their Motion for Summary Judgment.

1.      On December 29, 2018, Mike Harrop sent Greg Moriva an invitation by text message to join him at Buffalo Wild Wings to watch the Ultimate Fighting Championships fights on television that evening. (Moriva Deposition, dkt. # 26, 7:16-25.)

      **RESPONSE: Not disputed.**

2.      Mr. Moriva replied that he would take a shower in join Mr. Harrop at Buffalo Wild Wings. (Moriva Deposition, dkt. # 26, 10:1-3.)

      **RESPONSE: Not disputed.**

3.      When Mr. Moriva arrived at Buffalo Wild Wings, Mr. Harrop was there with Erica Briggs. (Moriva Deposition, dkt. # 26, 11:2-6.)

      **RESPONSE: Not disputed.**

4.      Later in the evening, Sam DiMaggio and Tanisha Fowler arrived separately at Buffalo Wild Wings. (Moriva Deposition, dkt. # 26, 11:10-22.)

        **RESPONSE: Not disputed.**

5.      Mr. Moriva had never met Ms. Briggs (Moriva Deposition, dkt. # 26, 10:14-16) or Ms. Fowler (Moriva Deposition, dkt. # 26, 11:2022) before that evening.

        **RESPONSE: Not disputed.**

6.      Ms. Fowler came in and sat next to Mr. Moriva. (Moriva Deposition, dkt. # 26, 12:2-3.)

        **RESPONSE: Not disputed.**

7.      Ms. Fowler gave Mr. Moriva the creeps so he did not make much effort to talk to her. (Moriva Deposition, dkt. # 26, 12:7-10.)

        **RESPONSE: Objection. Plaintiff's subjective belief is irrelevant to his Fourth Amendment claim and this fact should not be considered.**

8.      At one point, and Mr. Harrop's behest, the group relocated to The Flying Hound. (Moriva Deposition, dkt. # 26, 13:3-12.)

        **RESPONSE: Not disputed.**

9.      Mr. Moriva drove his own vehicle and Ms. Briggs and Ms. Fowler rode with Mr. Harrop. (Moriva Deposition, dkt. # 26, 13:7-10.)

        **RESPONSE: Disputed. Harrop states that Fowler rode with Moriva. (Dkt. 28, 10:9-20)**

10.     Sam DiMaggio left the group at that point and did not appear at the Flying Hound. (Moriva Deposition, dkt. # 26, 14:4.)

        **RESPONSE: Not disputed.**

11.     At the Flying Hound, Mr. Moriva went into the men's room, and when he came out, Mr.

Harrop and Ms. Briggs had left. (Moriva Deposition, dkt. # 26, 14:20-23.)

**RESPONSE: Disputed. Harrop states that everyone left at the same time.**

**Q: Mr. Moriva claims that at some point you an Erica just left without . . . saying good-by to him. Is that—**

**A: Well, I went to the bathroom for about three to five minutes, and when I came out from the bathroom, Erica did kind of grab me and say "Hey, let's go," and we started walking out, and then Tanisha and Greg stated walking out behind us.**

**....**

**Q: Mr. Moriva has testified that this was a setup, that you guys left without saying goodbye. So are you saying that that's incorrect?**

**A: I'm saying that's incorrect, yeah....**

**Q:  Did you—when you guys left The Flying Hound—**

**A: Uh-huh.**

**Q: --was there any further communication between you and Mr. Moriva that night?**

**A: No. I mean when Erica and I were walking to the truck, Greg and Tanisha were walking back to the truck, and she could have easily came and ridden with us. I mean they were having a good time. The conspiracy theory of me setting him up is really irritating me to say the least and—yeah, I had nothing to do with it.**

**(Dkt. 28, 11:6-25, 12)**

12.     Mr. Moriva was upset that Mr. Harrop had left and Mr. DiMaggio had never arrived, and

he wanted to go home. (Moriva Deposition, dkt. # 26, 17:16-18.)

**RESPONSE: Objection. Plaintiff's subjective intent is irrelevant to his Fourth**

**Amendment claim and this fact should not be considered.**

13.     Ms. Fowler convinced him to give her a ride, saying that she needed a ride home. (Moriva Deposition, dkt. # 26, 17:18-19.)

**RESPONSE: Not disputed that Moriva decided to give Fowler a ride to his home.**

14.     He initially suggested that she take an Uber, but she protested that she did not live far away, off Raymond Road, and she wanted to stop for cigarettes on her way home. (Moriva Deposition, dkt. # 26, 17:19-23.)

**RESPONSE: Not disputed that Moriva decided to take Fowler home. Disputed that Fowler requested that Moriva stop for cigarettes on the way to his home. (Dkt. 27, 16:10-21)**

15.     Mr. Moriva drove Ms. Fowler to a Kwik Trip on McKee Road that she specified, and when he suggested that she go in and get her cigarettes, she told him that he needed to come with her. (Moriva Deposition, dkt. # 26, 18:14-20.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

16.     Mr. Moriva got stuck buying Ms. Fowler's cigarettes. (Moriva Deposition, dkt. # 26, 20:1-2.)

**RESPONSE: Disputed. Moriva did not stop to buy Fowler cigarettes. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

17.     After they came out, they saw a car pulling up to the gas pumps and Ms. Fowler told Mr. Moriva that her cousin was in that car. (Moriva Deposition, dkt. # 26, 19:7-10.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

18.    Mr. Moriva then said, ""Okay, then you can get a ride home from them. Have your cousins give you a ride home." (Moriva Deposition, dkt. # 26, 19:10- 12.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not considered in determining the motion.**

19.    At that point, Ms. Fowler ran over to Mr. Moriva's truck and jumped in. (Moriva Deposition, dkt. # 26, 19:4-7.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

20.    Ms. Fowler then took Mr. Moriva's cell phone and walked over to the other car. (Moriva Deposition, dkt. # 26, 21:12-16.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

21.    Fowler told Mr. Moriva to follow her cousin's car to their apartment and that he could drop her off there and then go home. (Moriva Deposition, dkt. # 26, 26:14-19.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

22.     He did as he'd been told, and when they arrived at an apartment complex on Britta Parkway he stopped and Fowler got out of his truck and stood in the open door. (Moriva Deposition, dkt. # 26, 27:11-24; 42:1-9.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

23.     He did not pull away because he was afraid that if he did the door would close on Ms. Fowler. (Moriva Deposition, dkt. # 26, 28:1-3.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

24.     Ms. Fowler asked Mr. Moriva for twenty dollars, and he gave it to her thinking that he could get rid of her if she did. (Moriva Deposition, dkt. # 26, 43:12- 17.)

**RESPONSE: Disputed. Fowler requested $1,200 for sex, and Moriva did not pay her twenty dollars prior to them having sex to get rid of her. (Dkt. 27, 10:5-25 - 11:1-9) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

25.     Mr. Moriva put money on the console of his truck and Ms. Fowler took it and gave it to individuals standing nearby in exchange for what Mr. Moriva believed to be recreational drugs. (Moriva Deposition, dkt. # 26, 44:1-4.)

**RESPONSE: Disputed. Moriva did not make a stop and provide Fowler with money to buy drugs after leaving The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute**

of fact is not material to the issue of probable cause and should not be considered in determining the motion.

26.    Mr. Moriva told Ms. Fowler to get out of his truck and go into the apartments, but she would not get out of his truck, so he simply drove home with Ms. Fowler in his passenger seat. (Moriva Deposition, dkt. # 26, 32:18-24.)

**RESPONSE: Disputed. Moriva took Fowler directly to his home after The Flying Hound. (Dkt. 27, 16:10-21) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

27.    While he was driving, Ms. Fowler asked Mr. Moriva if he paid for sex, and he said that he did not. (Moriva Deposition, dkt. # 26, 28:1-3.)

**RESPONSE: Disputed. Fowler never asked Moriva if he paid for sex, nor was there a response from Moriva that he did not. Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence.  The cited evidence states "point, and the door was open, so if I would have took off, the door would have slammed shut and probably crushed her." (Dkt. 26, 28:1-3) Therefore, the Proposed Fact should not be considered.**

28.    When they arrived at his home, Mr. Moriva drove into his garage, and Ms. Fowler simply got out of his truck and walked through the unlocked door into his house. (Moriva Deposition, dkt. # 26, 45:15-18.)

**RESPONSE: Not disputed that Moriva unlocked the door to his home and let Fowler in.**

29.    At his home, he was able to get his phone back from Ms. Fowler and he then went to bed to get some sleep. (Moriva Deposition, dkt. # 26, 33:5-15.)

**RESPONSE: Disputed. Moriva had his phone and used his phone to open the garage. Moriva sat with Fowler in the garage, while she smoked a cigarette. The two then proceeded to go inside his home, where Moriva showed Fowler around his home. They then sat at the kitchen and talked. Moriva told Fowler about his job and how much money he makes, they smoked marijuana and consumed ecstasy, and then walked upstairs to have sex. Fowler was at Moriva residence for over an hour. (Dkt. 27, 17:9-18; 19:3-14; 20:3-15)**

30.     Ms. Fowler came to his bed and took Mr. Moriva's pants off and started performing oral sex on him. (Moriva Deposition, dkt. # 26, 34:21-22.)

**RESPONSE: Disputed. They both took their clothes off, laid in the bed, and began to touch on each other. (Dkt. 27, 19:17-20)**

31.     When Mr. Moriva said, "Stop," and moved away from her, she started strangling him. (Moriva Deposition, dkt. # 26, 34:22-23; 34:24 – 35:9.)

**RESPONSE: Disputed.  Fowler never strangled Moriva, nor did he say "stop." (Dkt. 27, 17:2-18; 18:15-25, 19) Moreover, when there is clear video evidence the Court must "view facts in light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378-81 (2007)).  The body camera footage from the time of the incident speaks for itself:**

> **"Officer Hickmann: So you're fooling around at your place?  Did you guys have intercourse there?**
>
> **Moriva: Yeah.  It was all consensual.  I mean, I really didn't even really cum too."**

**(Dkt. 18-1, Ex. A, 5:20:00-5:20:15 AM)**

32.     He kept peeling her hands off his neck and she kept putting them right back and continuing to strangle him, as she got on top of him and forced him to have intercourse. (Moriva Deposition, dkt. # 26, 37:10 – 38:8.)

**RESPONSE: Disputed. Fowler never strangled Moriva, nor did she force him to have sex with her. (Dkt. 27, 17:2-18; 18:15-25, 19) Moreover, when there is clear video evidence the Court must "view facts in light depicted by the videotape."** *Scott v. Harris***, 550 U.S. 372, 378-81 (2007)). The body camera footage from the time of the incident speaks for itself:**

> **"Officer Hickmann: So you're fooling around at your place? Did you guys have intercourse there?**
>
> **Moriva: Yeah. It was all consensual. I mean, I really didn't even really cum too."**

**(Dkt. 18-1, Ex. A, 5:20:00-5:20:15 AM)**

33.    They had sexual intercourse for about a minute. (Moriva Deposition, dkt. # 26, 40:5-7.)

**RESPONSE: Not disputed.**

34.    There had never been any agreement between them to the effect that they would have sex for money. (Moriva Deposition, dkt. # 26, 39:13-16; 40: 18-21.)

**RESPONSE: Disputed. Fowler agreed to have sex with Moriva on the condition that he would pay her $1200. (Dkt. 27, Fowler Dep. 10:19-25, 11-12) Nevertheless, the dispute of fact is not material to the issue of probable cause, because this was not the information conveyed to the Monona Officers and should not be considered in determining the motion.**

35.    There was never an agreement that they would have sex at all. (Moriva Deposition, dkt. # 26, 45:21.)

**RESPONSE: Disputed. Fowler agreed to have sex with Moriva on the condition that he would pay her $1200. (Dkt. 27, Fowler Dep. 10:19-25, 11-12) Nevertheless, the dispute of fact is not material to the issue of probable cause, because this was not the information conveyed to the Monona Officers and should not be considered in determining the motion.**

36.    Mr. Moriva then went to sleep. (Moriva Deposition, dkt. # 26, 46:8- 9.)

**RESPONSE: Not disputed that Moriva went to sleep after having sex with Fowler.**

37.    He awakened and found Ms. Fowler smoking. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Not disputed.**

38.    She asked him to take her home, and he readily agreed. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Not disputed that Fowler had to request that Moriva take her home. Disputed that he readily agreed. As noted in Plaintiff's Proposed Fact, Fowler had to request Moriva to take him home.  In addition, Fowler testified that Moriva opened a beer when she asked if Moriva was going to take her home. (Dkt. 27, Fowler Dep. 20:21-25)**

39.    They got back in his truck, and she said that she lived off Raymond Road, but after giving him directions that did not lead in that direction, she told him to drive her to Commercial Avenue, on the far east side of Madison. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Disputed. Fowler requested that Moriva go to an ATM machine to withdraw the money he owed her for sex and then drop her off on Commercial Avenue. (Dkt. 27, Fowler Dep. 21:1-15)**

40.    When they arrived at the address to which Ms. Fowler had directed them, Fowler again refused to get out of Mr. Moriva's truck. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Not disputed that Fowler refused to get out of his truck until her paid her the money he owed for sex.  (Dkt. 27, Fowler Dep. 21:3-15)**

41.    Ms. Fowler said she had four children and needed money. He offered her twenty dollars but she said she needed six or seven hundred dollars. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE:  Disputed. Fowler never said that she needed money, but only demanded the money that she was owed for sex. (Dkt. 27, Fowler Dep. 15:7-19) Moriva paid Fowler $100 in which Fowler stated that "she wanted a lot more than that."  (Moriva Dep. 46:15-17)**

**Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

42.    Moriva then decided to take Fowler to Harrop's house, as he had been the one to bring her into the evening's events. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Not disputed that Moriva began taking Fowler to Harrop's house after having sex with her. Dispute that Harrop brought Fowler into the evening's events. *See* (Dkt. 31, DPFF 10, 50) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.**

43.    As he drove, Fowler began to get violent in the car, grabbing the steering wheel, causing the truck to deviate into an adjacent lane. (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Not disputed that Fowler became angry after Moriva refused to pay her the money owed for sex.**

44.    As they were proceeding westbound on the beltline, nearing the Todd Drive exit, Fowler pulled her knife out and put it to Moriva's throat and yelled, "You don't seem to understand! You're going to turn this fucking truck around right now and go back to Monona drive where my enforcers can clean out all of your bank accounts!" (Plaintiff's Discovery Responses, dkt. # 30-2, 10.)

**RESPONSE: Not disputed that Fowler pulled her knife out.   Disputed that Fowler yelled "You don't seem to understand! You're going to turn this fucking truck around right now and go back to Monona drive where my enforcers can clean out all of your bank**

accounts!" *See* (Dkt. 27, Fowler Dep. 21:9-22) Nevertheless, the dispute of fact is not material to the issue of probable cause and should not be considered in determining the motion.

In addition, Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence, and it is inadmissible hearsay. *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011)(ruling that a party may not rely on inadmissible hearsay at summary judgment).   Therefore, the Proposed Fact should not be considered.

45.    Fowler used her knife to force Moriva to turn his truck around from west-bound to east-bound. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

46.    Fowler next forced Moriva at knifepoint to drive to an ATM machine and withdraw $300, which she took. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

47.    Fowler wanted more money, but the ATM would not let Moriva complete a second transaction, so Fowler permitted Moriva to drive, at knife-point, to the Monona Kwik Trip gas station, where Moriva told Fowler he would be able to get money from the ATM there. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

48.    After they arrived, Fowler stabbed Moriva twice while they were outside in the Kwik Trip parking lot. She punctured his left hand and stabbed his shoulder and slashed his winter coat. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

49.    From the parking lot, Moriva ran into the Kwik Trip, and Fowler chased him with her knife and then tried to stab him two more times inside the Monona Kwik Trip, but missed. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

50.    Then Fowler stole more money out of Moriva's coat pockets. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed that Fowler took Moriva's wallet and cash.**

51.    Moriva yelled to the Monona Kwik Trip clerk to call the police, and the clerk did so. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

52.    Monona Police Officer Taylor Pederson responded and found Fowler outside holding a knife. (Police Reports, dkt. # 30-4, 7; Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

53.    Without prompting, Fowler stated, "Yes, I was gonna cut his ass! You hear me?" (Police Reports, dkt. # 30-4, 7; Plaintiff's Discovery Responses, dkt. # 30- 2, 11.)

**RESPONSE: Not disputed.**

54. Fowler told Officer Pederson that Mr. Moriva owed her $600.00 and refused to pay her. (Police Reports, dkt. # 30-4, 7.)

**RESPONSE: Not disputed.**

55.    Fowler was handcuffed and arrested. (Police Reports, dkt. # 30-4, 7; Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed that Fowler was detained on scene.**

56.    Police Officer Ryan Hickmann interviewed Mr. Moriva at the Kwik Trip. (Police Reports, dkt. # 30-4, 4.)

**RESPONSE: Not disputed.**

57.    Mr. Moriva told Officer Hickmann that Ms. Fowler's enforcers were calling his phone, and it did ring several times, always showing the same caller number, while Officer Hickmann was interviewing Mr. Moriva. (Police Reports, dkt. # 30-4, 4.)

**RESPONSE: Not disputed.**

58.    Mr. Moriva truthfully recounted most of the events of the evening to Officer Hickmann except that he said the sexual intercourse had been consensual. (Police Reports, dkt. # 30-4, 4-5.)

**RESPONSE: Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence. The cited police report contains no statement that "Moriva truthfully recounted most of the events of the evening to Officer Hickmann except that he said the sexual intercourse had been consensual." *See* (Dkt. 30-4) Further, the Proposed Fact does not cite any other evidence to support the Proposed Fact. Therefore, the Proposed Fact should not be considered.**

59.    Mr. Moriva told Officer Hickmann that he had taken money from ATMs and given to Ms. Fowler only because she had threatened him with a knife and with her "enforcers." (Police Reports, dkt. # 30-4, 5.)

**RESPONSE: Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence. The cited police report contains no statement that "Moriva told Officer Hickmann that he had taken money from ATMs and given to Ms. Fowler only because she had threatened him with a knife and with her "enforcers.'" *See* (Dkt. 30-4) Further, the Proposed Fact does not cite any**

other evidence to support the Proposed Fact. **Therefore, the Proposed Fact should not be considered.**

60.    Mr. Moriva told Officer Hickmann that after he had arrived at the Kwik Trip where they were speaking, Ms. Fowler had lunged at him and stabbed him in the hand, and then followed him into the store saying she was going to stab him. (Police Reports, dkt. # 30-4, 5.)

    **RESPONSE: Not disputed.**

61.    Hickmann observed a laceration on the palm of Mr. Moriva's left hand and two red marks on the side of his neck. (Police Reports, dkt. # 30-4, 4.)

    **RESPONSE: Not disputed that Hickmann observed a laceration on the palm of Plaintiff's left hand, and two red marks on the left side of his neck.**

62.    Moriva was then told by the Monona police that he had to go back to the Monona police station. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Disputed. Moriva was not handcuffed at the Kwik Trip, voluntarily consented to allow Officer Hickmann to drive him to the Police Department for safety purposes, and he never asked if he could drive his truck to the station. (Dkt. 18-1, Ex. A, 5:34:40-5:36:30 AM) Moreover, when there is video evidence, the Court should "view facts in the light depicted by the videotape." *Scott v. Harris*, 550 U.S. 372, 378-81 (2007) The clear video evidence speaks for itself:**

> **"Officer Hickmann: Greg what I'd like to do is bring you back to the Monona Police Department so that we can get a full statement . . . Plus, I don't feel all that comfortable doing this with the brothers around to, especially being that a weapon was already used. So, if you're cool with it. I'll drive you up there. It's about three minutes away. I can bring you back afterwards.**
>
> **Moriva: Sure."**
>
> **….**

> **"Officer Hickmann: Did you already lock your truck?**
>
> **Moriva: Yeah, I got it.**
>
> **Officer Hickmann: So my squad is actually around the corner.**
>
> **Moriva: Okay.**
>
> **Officer Hickmann: So I'm just going to have you take a seat in here, and then I just got to go talk to the deputy, just to let him know that we're going back to the PD.**

**(Dkt. 18-1, Ex. A, 5:34:40-5:36:30 AM)**

63.    He asked the Monona police officer if he could drive his truck to the Monona police station and the officer said no and that Moriva had to ride in the back of the police car and he didn't have a choice on this. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Disputed. See Defendants Response to Plaintiff's Proposed Finding of Fact # 62.**

64.    Moriva was then locked into the back of the Monona police car. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Disputed. See Defendants Response to Plaintiff's Proposed Finding of Fact # 62.**

**In addition, Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence and is pure speculation. Therefore, the Proposed Fact should not be considered.**

65.    Officer Pederson drove Ms. Fowler to the Monona Police Station. (Police Reports, dkt. # 30-4, 7.)

**RESPONSE: Not disputed.**

66.   When they arrived at the Monona police station, the police put Moriva and Fowler into two separate interrogation cells and locked them in. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence and is pure speculation. The video evidence shows that they were simply placed in separate interview rooms. (18-1, 5:42-5:46AM) Therefore, the Proposed Fact should not be considered.**

67.   At the police station, Ms. Fowler gave Officer Pederson Mr. Moriva's wallet. (Police Reports, dkt. # 30-4, 7.)

**RESPONSE: Not disputed.**

68.   Officer Pederson searched Ms. Fowler and found a large amount of money in one of her pockets, and a vaporizer pen which was seized and disposed of because it was believed to contain a small amount of marijuana. (Police Reports, dkt. # 30-4, 9.)

**RESPONSE: Not disputed.**

69.   Ms. Fowler was then interviewed by Sergeant Ryan Losby. (Police Reports, dkt. # 30-4, 9.)

**RESPONSE: Not disputed.**

70.   She told him that she and Mr. Moriva had gone by themselves to a bar with a name like The Holler Inn, where she talked to Mr. Moriva about sex and they agreed to have sex for $600. (Police Reports, dkt. # 30-4, 9.)

**RESPONSE: Disputed. Sgt. Losby reported that Tanisha said "that they were at Buffalo Wild Wings on the West side of Madison.  They then went to the Hollar Inn bar or something with a name like that (I later could not identify this bar).  At this point it was just Tanisha and Greg.  She was talking to Greg about sex.  She said that they agreed to have sex**

17

for $600.  They went to Greg's house (5684 Kinsale Drive Fitchburg, WI Dane County) and they had sex ...." (Dkt. 30-4, 9).

71.    This was the only information any Monona police officer received that Mr. Moriva had agreed to pay for sex. (Police Reports, dkt. # 30-4.)

**RESPONSE: Not disputed that Moriva agreed to pay for sex. The remainder of the Response contains speculation—Plaintiff cannot assert on behalf of the Monona Police officers that this was the only information any Monona police officer received. Furthermore, his assertion is wrong. Officer Hickmann's body camera footage speaks for itself:**

> **"Officer Hickmann: Did they just come in here?**
>
> **Kwik Trip Employee: He came in to get away from her. I'm going to take a guess, possibly a prostitute. He didn't pay her is what it sounded like. She said that he assaulted her and that he bribed her, so she stabbed him."**

**(Dkt. 18-1, Ex. A, 5:14:29-5:14:47AM)**

> **"Fowler's brother: He [Moriva] needs to stop lying. . . He called to trick with her earlier. He ain't telling you the whole story.  He saying that he getting robbed today. He called to trick with her earlier. They been together all day getting after it. He ain't telling you the whole story."**
>
> **Officer Hickmann: I understand that...."**

**(Dkt. 18-1, Ex. A, 5:26:20-5:26:42 AM)**

**A "trick" or "to trick" is a slang word that means "1. noun. A person who spends money on gratifying their sexual impulses and/or pleasures. 2. adjective. The word has the ability to describe a person or an action. 3. Verb (to trick/trickin'/trickin' off) The act of splurging or spending cash on fulfilling one's sexual desires." (In Urban Dictionary. Retrieved March 30, 2023, from http://www.urbandictionary.com/define.php?term=trick by Heiress Reigns on October 16, 2008).**

Further, dispute that the information provided by Fowler was unreliable or based on motive to shift blame:

> Q:    When you were in Monona police station in custody, did you know you were potentially in jeopardy of being charged with armed robbery or battery or something like that?
>
> A:    I only knew when he – when he brought me a list of all my charges.
>
> Q:    When was that?
>
> A:    When I was in the Monona Police Department.
>
> ***
> Q:    And did you say that before or after you saw the list of charges against you?
>
> A:    Both.
>
> ***
> Q:    Did you tell him that he owed you money for sex?
>
> A:    Yes.
>
> Q:    And do you remember whether that was before or after you saw the charges against you?
>
> A:    Both.
>
> Q:    Were you aware that in saying that Mr. Moriva owed you money for sex you were confessing to the crime of prostitution?
>
> A:    I didn't care.
>
> Q:    Did you think that the Monona police were going to enforce your contract with Mr. Moriva and get you your money?
>
> A:    I don't even know how to answer that question.

> **Q:    Why were you telling them that you wanted your money?**
>
> **A:    Because it was my money.**
>
> **Q:    Did you expect them to do anything about that?**
>
> **A:    No.**
>
> **Q:    Why tell them then?**
>
> **A:    It wasn't like me saying oh, I'm telling you to get me my money. I was just like speaking out loud like we wouldn't be in this situation if he would have just paid me my money. It was just like an outburst. I said it all night. It was just—I kept repeating it, all I wanted was my money, he could have just gave me my money, that's all I wanted, not harming him, not doing anything out of the ordinary but requesting what was promised to me, and I didn't get it.**

**(Dkt. 27, Fowler Dep. 35:20-25, 36:1-14, 38:13-25, 39)**

72.    Detective Sgt. Losby asked Ms. Fowler if there were any witnesses to Mr. Moriva's agreement to pay $600 for sex and she said there were none. (Police Reports, dkt. # 30-4, 9.)

**RESPONSE: Not disputed that there were no witnesses to Moriva agreement to pay Fowler $600 for sex.**

73.    Moriva was read his Miranda rights by Detective Sgt. Losby and exercised his right to remain silent. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

74.    Moriva was then arrested at the Monona police station by Sgt. Ryan Losby for soliciting a prostitute. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed that Moriva was arrested for prostitution under Wis. Stat. § 944.30 after Det. Losby investigated the incident. (Dkt. 19-1, p. 2; Dkt. 30-4, p. 15)**

75. Moriva was taken to the Dane County Jail. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Not disputed.**

76.    On January 14, 2019, Assistant District Attorney Stacia Dunn sent Moriva's criminal defense attorney, Jessa Nicholson, an email stating that her office had decided not to prosecute Mr. Moriva's prostitution charge. (Plaintiff's Discovery Responses, dkt. # 30-2, 11.)

**RESPONSE: Plaintiff's Proposed Fact does not comply with the requirements of Fed. R. Civ. P. 56(c), as it is not supported by any reference to admissible evidence, and it is inadmissible hearsay. *MMG Fin. Corp. v. Midwest Amusements Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011)(ruling that a party may not rely on inadmissible hearsay at summary judgment).  Further, this proposed finding is irrelevant to Plaintiff's claims. Therefore, the Proposed Fact should not be considered.**

Dated on this 10th day of April, 2023.

WIRTH + BAYNARD

Attorneys for Defendants

*/s/ Kyle R. Moore*
Kyle R. Moore, WI State Bar No. 1101745
9898 West Bluemound Road, Suite 2
Wauwatosa, Wisconsin 53226
T: (414) 291-7979 / F: (414) 291-7960
E-mail: krm@wbattys.com