IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

GREGORY A. MORIVA,

                              Plaintiff,

        v.

CITY OF MONONA and RYAN LOSBY,

                              Defendants.

OPINION and ORDER

21-cv-817-jdp

Plaintiff Gregory Moriva contends that defendant Ryan Losby, a City of Monona police detective, arrested him without probable cause. For Moriva, the arrest was a bad end to a bad night. Moriva alleges that a woman named Tanisha Fowler pressured him into having sex and then demanded that Moriva pay her for it. Fowler, with a knife drawn, forced Moriva drive to an ATM to get money. When Moriva pulled into a Kwik Trip parking lot and tried to leave the car, Fowler stabbed him. Officers were called to the scene, and they brought both Fowler and Moriva in for questioning. At the station, Fowler told Losby that Moriva had agreed to pay her $600 for sex. Fowler was arrested. But so was Moriva, on prostitution charges, primarily on the basis of Fowler's statements.

Moriva brings a false-arrest claim against Losby under 42 U.S.C. § 1983, alleging that the arrest was unsupported by probable cause, thus violating his rights under the Fourth Amendment.[1] Losby moves for summary judgment. Dkt. 17. Whether Fowler was credible was a close call. But Losby's qualified immunity affords him a zone of protection for errors of

---

[1] Moriva also names the City of Monona as a defendant to obtain a declaratory judgment that the city is obligated to indemnify Losby, but Moriva does not assert any claims directly against the city itself.

judgment, so the question here is whether there was "arguable probable cause." A law enforcement officer, encountering a violent interpersonal dispute like the one in this case, must make judgments about the credibility of the participants. Losby's judgment here was one a reasonable officer could make, so the court concludes that the arrest was supported, at least, by arguable probable cause. The court will grant Losby's motion.

UNDISPUTED FACTS

The court begins with an evidentiary issue. Losby cites police body camera footage in his reply in support of his proposed facts, *see* Dkt. 36, ¶¶ 23, 67, and to dispute some of Moriva's proposed facts, *see* Dkt. 37, ¶¶ 31, 32, 62, 66. Losby stated that he mailed this footage to the court on a thumb drive. Dkt. 18-1. But the court has not received the thumb drive, and Losby did not resubmit the thumb drive, even when contacted by the clerk's office. So the court will disregard the body-camera evidence in deciding Losby's motion.

With that in mind, the following facts are undisputed except where noted.

Plaintiff Greg Moriva went to a Buffalo Wild Wings restaurant on the evening of December 29, 2018, to watch UFC fights with his friend Mike Harrop and Harrop's girlfriend Erica Briggs. Shortly after Moriva arrived at the restaurant, their group was joined by Tanisha Fowler, Briggs's cousin. (*See* Dkt. 27 (Fowler Dep. at 13:14–17)). Moriva had not met Fowler before. After the fights, the group relocated to The Flying Hound, a bar in Fitchburg. As the evening wound down, Fowler asked Moriva for a ride home. Moriva initially told Fowler to take an Uber, but he eventually agreed to drive her home.

The parties dispute what happened immediately after Moriva and Fowler left the bar; Moriva and Fowler remember the evening very differently. But it's undisputed that Fowler and Moriva had sex at Moriva's home, and that Fowler asked to be paid for it.

What happened after that is mostly undisputed. Moriva gave Fowler $100, but she said that she needed more than that. Moriva decided to drive Fowler to Harrop's house in the hopes that Harrop could sort things out. But on the drive to Harrop's, Fowler pulled a knife, pressed the knife to Moriva's throat, and demanded that Morvia drive to an ATM.

Moriva went to a drive-through ATM and withdrew $300, which Fowler took. Fowler wanted more money, but the ATM wouldn't process another withdrawal. Moriva told Fowler that he would use the ATM at a nearby Kwik Trip. At the Kwik Trip parking lot, Moriva tried to exit the car. Fowler stabbed Moriva in his left hand and his left shoulder. Moriva ran into the Kwik Trip and Fowler chased after him, still wielding the knife. Moriva yelled to the cashier to call the police. The cashier called 911 and reported that someone had been stabbed.

Monona Police officers Taylor Pederson and Ryan Hickmann arrived at the Kwik Trip shortly after, at around 5:30 a.m. Hickmann saw Fowler exit the Kwik Trip holding a black folding knife. Hickmann ordered Fowler to place her hands behind her back. Fowler complied and Hickmann placed her in handcuffs. Pederson took Fowler to the Monona police station.

Hickmann made contact with Moriva, and Moriva gave Hickmann his account of the evening. Fowler had been "all over him" all night and they had sex at Moriva's house. Dkt. 18-2, at 2 (Hickmann's police report). Afterwards, Fowler demanded several hundred dollars "to support her children." *Id.* at 1. Fowler told Moriva that she would call her "enforcers" if he refused to pay. Moriva told Hickmann that he drove Fowler to the ATM at knifepoint and that Fowler stabbed him. As Moriva was reporting his story to Hickman, one of Fowler's

3

brothers arrived at the Kwik Trip. Fowler's brother told Hickmann that Moriva was lying and that Moriva and Fowler "had been tricking all day and getting high together." *Id.* at 2. Hickmann later learned from Dane County deputies that Fowler's brothers were her enforcers. Officer Hickmann took Moriva to the police station in his squad car. Officers placed Fowler and Moriva in separate interrogation rooms at the station.

Defendant Ryan Losby, a police detective, was called in to work on the investigation. Hickman and Pederson briefed Losby about their investigation on the scene, and then Losby interviewed Fowler. Fowler told Losby that Moriva had agreed to pay her $600 for sex, but that he tried to pay her only $100. She admitted that she told Moriva to drive to an ATM to get her money and that she had her knife out in the car. But she stated that she never threatened Moriva and that she never put the knife up to Moriva's neck. Fowler also denied stabbing Moriva in the Kwik Trip parking lot. Losby asked Fowler if she was a prostitute, and Fowler said that she wasn't. Losby asked Fowler if anyone witnessed Moriva agree to pay Fowler for sex. Fowler said no, but she said that "[Moriva] was buying some pussy and he will not admit it." Dkt. 19, ¶ 21 (Losby declaration).

Losby then went to interview Moriva. Losby read Moriva his *Miranda* rights. Moriva asked for a lawyer, so Losby did not immediately ask Moriva any questions. Some time later, Losby asked Moriva whether he was free to go when he was with Fowler and whether he gave Fowler consent to take his money.[2] Moriva answered no to both questions. Losby asked Moriva if he wanted to press charges against Fowler, and Moriva said he did. After Losby finished the interviews with Fowler and Moriva, he conferred with Hickmann and Pederson.

---

[2] Neither side clarifies how long Losby waited before asking Moriva questions. Moriva does not contend that Losby's decision to resume questioning violated his Fourth Amendment rights.

Fowler was charged with armed robbery, false imprisonment, injury by the negligent handling of a weapon, and prostitution. Losby decided to charge Moriva with prostitution for "having sex with [Fowler] for the agreed amount of $600." Dkt. 19-1, at 2 (Losby's supplemental report). The Dane County district attorney eventually decided not to prosecute the prostitution charge against Moriva.

The court will discuss additional facts in the analysis section of the opinion.

ANALYSIS

Moriva contends that Losby violated his Fourth Amendment rights by arresting him without probable cause. An officer has probable cause to make an arrest when the facts and circumstances within the officer's knowledge, and those of which he has reasonably trustworthy information, would lead a prudent person to believe that the suspect has committed a crime. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). The inquiry is objective; the subjective motivations of the officer don't matter. *Id*. Probable cause does not require a preponderance of the evidence; it requires only a probability or a substantial chance of criminal activity. *Purvis v. Oest*, 614 F.3d 713, 722–23 (7th Cir. 2010). Whether there is probable cause depends on the elements of the crime at issue, here prostitution. In Wisconsin, a person is guilty of prostitution if he or she "[h]as or offers to have or requests to have nonmarital sexual intercourse for anything of value." Wis. Stat. § 944.30(1m)(a).

The doctrine of qualified immunity provides law enforcement officers with an additional layer of protection for reasonable errors of judgment. *Hughes v. Meyer*, 880 F.2d 967, 970 (7th Cir. 1989). In false arrest cases, the arresting officer is entitled to qualified immunity if "a reasonable officer could have mistakenly believed that probable cause existed." *Fleming v.*

*Livingston County, Ill.*, 674 F.3d 874, 879–80 (7th Cir. 2012) (internal quotes omitted). This standard is often termed "arguable probable cause." *Id*.

Qualified immunity is an affirmative defense, but the plaintiff carries the burden of defeating it once it is raised. *Rabin v. Flynn*, 725 F.3d 628, 632 (7th Cir. 2013). A plaintiff can meet this burden by "identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he was acting lawfully." *Abbott v. Sangamon Cty.*, 705 F.3d 706, 723–24 (7th Cir. 2013). The probable cause determination and the qualified immunity inquiry are closely related, so the court will consider them together. *See Rooni v. Biser*, 742 F.3d 737, 740 (7th Cir. 2014) (district court may "jump[] directly to the qualified immunity inquiry"). The dispositive question here is whether Losby had arguable probable cause to believe that Moriva had agreed to pay Fowler for sex.

The first issue is the scope of Losby's knowledge. All agree that Hickmann and Pederson briefed Losby before he arrested Moriva, although there is scant evidence about what specific information was conveyed to Losby. Hickman's and Pederson's knowledge could be imputed to Losby under the "collective knowledge doctrine," if the three law enforcement officers were in communication with each other when working at the scene. *United States v. Parra*, 402 F.3d 752, 764 (7th Cir. 2005) (quoting *United States v. Nafzger*, 974 F.2d 906, 911 (7th Cir. 1992)). When officers are working together, the knowledge of the officers is imputed to each other, even if there is no express testimony or detailed information about the information actually conveyed. *Id*. Losby interviewed Fowler, and she spoke to him at length. Dkt. 19-1 (Losby report). Moriva declined to speak to Losby, although ultimately Moriva told Losby that he did not feel that he was free to leave when he was with Fowler, and that he had not consented to

6

Fowler taking his money. *Id*. Hickman had interviewed Moriva at the scene and reported to Losby what Moriva had said. *Id*. Hickman and Pederson were called to the scene to investigate, and Losby was called to the station to continue the investigation, and he consulted with the two other officers. Under these circumstances, the collective knowledge doctrine applies, and the court will impute the knowledge of Hickman and Pederson to Losby.

The next issue is whether Losby's knowledge, including that imputed to him, amounts to arguable probable cause. Losby knew that Moriva had had non-marital intercourse with Fowler because Moriva had admitted that to Hickman. So the dispositive question is whether Losby had arguable probable cause to believe that Moriva, despite his denials, had agreed to pay for Fowler for the sex.

Losby had, primarily, the statements of Fowler and Moriva. But Losby also knew the general context: Moriva and Fowler had recently had sex; in the early hours of the morning Fowler was demanding money; and Moriva had withdrawn $300 from an ATM to give to her. Fowler had stabbed Moriva, and they ended up at a convenience store with Moriva asking the clerk to call the police.

Moriva and Fowler told the police different stories. Fowler said it was a prostitution date that Moriva refused to pay for, which prompted her to resort to aggressive self-help. Moriva said it was consensual sex with someone he met through a friend, but that afterward Fowler had, without forewarning, demanded money and pulled a knife to get it. A reasonable officer, with no reason to trust or doubt either Fowler or Moriva, could believe that the general context made Fowler's version more plausible than Moriva's, for two reasons. First, Fowler's statements were self-incriminating, because she admitted to both prostitution and robbery. A statement against penal interest "carries with it a presumption of reliability." *United States v.*

*Olson*, 408 F.3d 366, 371 (7th Cir. 2005). Second, in Fowler's version of the events, everyone has an understandable motive; but in Moriva's version Fowler abruptly robs a friend of her cousin after a night of companiable drinking and sex. The general context is enough to provide arguable probable cause for an officer in Losby's position, who had to decide the credibility of the participants in a violent interpersonal conflict.

Moriva's main argument is that Losby violated clearly established law by crediting Fowler's statement. Moriva contends that no reasonable officer could rely on Fowler's statements in light of *United States v. Geasland*, 694 F. App'x 422 (7th Cir. 2017). In *Geasland,* a search warrant case, the court observed that "informants who have been arrested or who have been accused of wrongdoing have a motive to cast blame elsewhere and secure credit for cooperating with the authorities." *Id.* at 432. Moriva contends that based on that principle, a reasonable officer would realize that Fowler's "sex-for-money story" was an obvious attempt "to shift the narrative from an account of a ruthless violent criminal stealing hundreds of dollars from a terrorized, innocent, less than worldly man to the story of a working girl just taking understandable measures to collect her wages." Dkt. 33, at 12.

But *Geasland* did not involve closely analogous facts. *Geasland* isn't about statements made by an arrestee; the tipster in that case was a citizen informant. Moriva cites *Geasland* for the general principle that informants who have been arrested or accused of wrongdoing have motive to cast blame elsewhere. But he cites no cases where the Seventh Circuit concluded, or even suggested, that it was unreasonable for an officer to rely on a witness's self-incriminating statements because the statements were made after the witness was accused of wrongdoing. Nor does Moriva cite a case in which a law enforcement officer was held liable for believing one party, but not the other, in a violent interpersonal dispute. The general principle that

Moriva draws from *Geasland*—that witnesses who have been arrested have an incentive to assign blame to others—would not make it clear to an officer in Losby's position that Fowler's statements were necessarily unreliable.

Even if Fowler's statement was an attempt to garner sympathy from Losby, "a motive to curry favor . . . does not necessarily render an informant unreliable." *Olson*, 408 F.3d at 371. The fact that a witness has something to gain by accusing another person of a crime "merits a greater dose of skepticism" in assessing the witness's credibility, *id.* at 370, but it isn't dispositive. Indeed, in *Olson*, the court of appeals concluded that it was reasonable for an officer to rely on the inculpatory statements of a recently-arrested informant notwithstanding the defendant's argument that the admissions were "nothing more than a naked attempt to mitigate his culpability through currying the favor of the police." *Id.* at 371. In light of *Olson*, a reasonable officer could credit Fowler's self-incriminating statements even if she had some incentive to shift blame to Moriva.

A reasonable officer in Losby's position could have concluded that Fowler's self-incriminating statements established a substantial probability that Moriva had agreed to pay Fowler for sex. Losby is entitled to qualified immunity.

ORDER

IT IS ORDERED that defendants' motion for summary judgment, Dkt. 17, is GRANTED. The clerk of court is directed to enter judgment for defendants and close the case.

Entered June 13, 2023.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge